CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 29, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| Nathan Thomas, Personal Representative of the Estate of Kenneth G. Thomas, Deceased<br><br>and<br><br>Nathan Thomas, Personal Representative of the Estate of Barbara L. Thomas, Deceased<br><br>Plaintiffs,<br><br>v.<br><br>Allstate Life Insurance Company also known as Everlake Life Insurance Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 5:23-cv-00057 |

### MEMORANDUM OPINION

This matter is before the court on Plaintiff Nathan Thomas's ("Thomas")[1] Motion for

Summary Judgment and Partial Summary Judgment, (Dkt. 19 [hereinafter "Thomas Mot."])

and Defendant Allstate Life Insurance Company's ("Allstate")[2] Motion for Summary

Judgment, (Dkt. 21 [hereinafter "Allstate Mot."]).  The court held a hearing on the motions

on October 1, 2024, and the matter is ripe for decision.  For the reasons that follow, the court

will grant in part and deny in part Thomas's motion for summary judgment and partial

---

[1] Nathan Thomas is the son of Barbara Thomas and Kenneth Thomas and the executor of both their estates.  For purposes of this memorandum opinion, "Thomas" is used to refer to both plaintiffs in this action, while his parents are referred to as "Barbara and Kenneth."

[2] On November 1, 2021, Allstate was sold and renamed Everlake Life Insurance Company ("ELIC").  (Answer at 1 n.1 (Dkt. 7).)  For purposes of this memorandum opinion, "Allstate" is used to refer to the defendant.

summary judgment, and will deny Allstate's motion for summary judgment.  A bench trial on the remaining issues is scheduled for January 29, 2025.

## I.  Background

### A.  Factual History[3]

Beginning in 1989, Allstate insured Barbara and Kenneth under a long-term care certificate, providing joint nursing home and home health care insurance coverage.  (Dkt. 20-1 [hereinafter "Certificate"].)  The Certificate provides a "Daily Benefit" of $144 "for each day that an Insured Person is confined in a *Nursing Home*" after a "waiting period."  (*Id.* at 3, 7 (emphasis added).)  The "waiting period" is defined as "90 days of confinement" in a "*Nursing Home*."  (*Id.* at 7 (emphasis added).)  The policy also provides that premiums would be waived "for periods of *Nursing Home* Confinement for which benefits are payable."  (*Id.* (emphasis added).)

"Nursing Home" as used in the Certificate is a defined term with a three-prong definition.  Under the Certificate, a "Nursing Home" is a facility which:

> 1.   is licensed by the state in which the facility is located to provide Nursing Care for sick and injured persons at their expense;
> 2.   has 24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse; and
> 3.   maintains daily medical records for each patient.

(*Id.* at 2.)

---

[3] The following material facts are taken from the summary judgment record and, unless otherwise stated, are undisputed. Facts not material to the issues are omitted.

As to the first prong of the "Nursing Home" definition above, "Nursing Care" is also a defined term in the policy. (*Id.*) "Nursing Care means Medically Necessary Skilled, Intermediate or Custodial Care." (*Id.*) In turn, those terms are also defined by the Certificate.

- "Medically Necessary" is defined as "care or services for Chronic Illness which could not be omitted without adversely affecting the Insured Person's health or physical condition." (*Id.*)

- "Intermediate Care" is defined as "any level of Nursing Care that is greater than Custodial Care and is performed in accordance with the Plan of Treatment." (*Id.*)

- "Custodial Care" is defined as "Nursing Care which is mainly for the purpose of assisting in the Activities of Daily Living of the Insured Person and is performed in accordance with the Plan of Treatment." (*Id.*)

"Chronic Illness" and "Activities of Daily Living" are also defined by the Certificate. "Chronic Illness means an illness for which an Insured Person requires assistance with one of the Activities of Daily Living, as certified by a Doctor in a Plan of Treatment." (*Id.*) And "Activities of Daily Living means eating, toileting, mobility, bathing or dressing." (*Id.*)

Barbara and Kenneth moved into Sunnyside Retirement Community Eiland Assisted Living ("Sunnyside") on August 3, 2020. (Dkt. 20-5 [hereinafter "Licenses"]; Dkt. 22-14; Dep. of Nathan Thomas 20:1–7, June 3, 2024 (Dkt. 36) [hereinafter "Thomas Dep."].)[4] During the relevant period, Sunnyside was licensed by the Commonwealth of Virginia as an "Assisted Living Facility." (*See* Licenses.) According to the Licenses, Sunnyside was allowed to provide both "Residential Living Care" and "Assisted Living Care." (*Id.*)

---

[4] The parties included portions of the deposition transcript of Nathan Thomas in their briefing on these cross-motions for summary judgment. The court requested the full transcript, which is part of the court's record. (*See* Dkt. 36.)

Just before moving into Sunnyside, in July 2020, Nathan Thomas initiated claims under the Certificate on Barbara and Kenneth's behalf.[5]  (Dkt. 20-4 at 1; Thomas Dep. at 20:18–21.)  In initiating and pursuing the claims, Thomas first interacted with Allstate's third-party administrator, LifeCare.[6]  (*See* Thomas Dep. at 34:19–23; Dkt. 20-8; Dep. of Eugene Sanford 34:12–14, June 28, 2024 (Dkt. 34) [hereinafter "Sanford Dep."].)[7]

In August 2020, LifeCare sent a "Long Term Care Facility Questionnaire" ("the Questionnaire") to Sunnyside.  (Dkt. 20-3 at 2; Dkt. 20-4 at 2; *see* Dkt. 20-6 [hereinafter "Questionnaire"].)  The Questionnaire was returned on September 1, 2020.  (Dkt. 20-3 at 2; Dkt. 20-4 at 2.)  In filling out the Questionnaire, Sunnyside noted that it had "2 Registered Nurses" who worked one eight-hour shift per day and "10 [Licensed Practical Nurses]/[Licensed Vocational Nurses]" who worked three eight-hour shifts per day. (Questionnaire at 1).  In responding to the question "With what frequency do you log patient medical or service records?" Sunnyside wrote "every shift."  (*Id.*)

On September 1, 2020, Evelia Garcia, the initial claim handler, recommended to her supervisor, Alina Smith, that the claims be denied.  (Dkt. 20-3 at 3.; Sanford Dep. at 44:3–45:7.)  Two days later, on September 3, 2020, a round table discussion was held between Garcia, a staff nurse, and Garcia's management team to discuss the claims.  (Dkt. 20-3 at 4.)  The team determined that, while Barbara and Kenneth were Chronically Ill and therefore

---

[5] Thomas initiated the claims by calling a "1-800" number for Allstate.  (Thomas Dep. at 25:17–20.)  At Allstate's suggestion, Thomas opened two separate claims, one for Barbara and one for Kenneth.  (*Id.* at 28:24–29:12.)  Because both claims were denied for the same reason and together form the heart of this case, the claims are discussed jointly.

[6] The record is not clear as to the exact relationship between Allstate and its third-party administrator, LifeCare.  But neither party disputes that the actions of LifeCare in denying the claims are attributable to and relevant in analyzing the breach of contract claim against Allstate.

[7] The parties included portions of the deposition transcript of Eugene Sanford in their briefing on these cross-motions for summary judgment.  The court requested the full transcript, which is part of the court's record.  (*See* Dkt. 34.)

eligible for coverage, the Certificate did not provide coverage for their residence at Sunnyside because under the policy, "there is no [assisted living facility] coverage." (*Id.*)  The same day, Garcia called Thomas to advise him "that [assisted living facility] coverage is not available under the policy." (*Id.*)  In another call to Thomas, Garcia advised him that although Barbara and Kenneth were eligible for coverage based on their medical history, Sunnyside, as a facility, "is denied." (*Id.* at 5.)  Following an email from Thomas explaining his position, the file was referred for to a supervisor a "second signature." (*Id.* at 6.)  Although the file acknowledged Thomas's position that Sunnyside "should be approved as it is providing custodial care for" Barbara and Kenneth, "per the information on file from Sunnyside . . . it is licensed as an assisted living facility" and as a result it was "recommend[ed] that the [nursing home] denial be upheld." (*Id.*)  On September 11, 2020, Smith emailed LifeCare's denial recommendation to Eugene Sanford, a Lead Consultant at Allstate, for his review.  (Sanford Dep. at 46:25–47:19.)  Three days later, Sanford emailed back to LifeCare his agreement that "Sunnyside Retirement Community Assisted Living is not a covered nursing home provider." (Dkt. 20-3 at 5.)

Through Thomas, Barbara and Kenneth made three appeals requesting that Allstate provide coverage based on the Certificate's defined terms.  (*See id.* at 6–10.)  Allstate maintained its denial of coverage on the ground that Sunnyside "is not a covered provider under the policy." (*Id.* at 7.)  During this period, Allstate sent Thomas letters denying the claims and maintaining that denial throughout the appeals process.  (*See* Dkt. 20-7 (Sept. 14, 2020 Denial Letter); Dkt. 20-9 (Oct. 21, 2020 Denial Letter); Dkt. 20-11 (Nov. 19, 2020 Appeal Denial Letter); Dkt. 20-13 (Dec. 18, 2020 Appeal Denial Letter).)

Other than the eligibility of Sunnyside, both Barbara and Kenneth were insured under the Certificate, medically eligible to receive benefits, and were receiving the appropriate level of care from Sunnyside as certified by a doctor in a plan of treatment.  (Sanford Dep. at 64:13–18, 66:10–14, 69:25–70:8, 103:15–22, 120:12–21.)   Barbara and Kenneth also met the Certificate's definition of Chronic Illness for their claims.  (Sanford Dep. at 120:12–17; Dkt. 20-3 at 5; Dkt. 20-4 at 4).

Barbara and Kenneth resided at Sunnyside for more than two years, between August 3, 2020, and January 28, 2022.  During that time, the Certificate notes a "Daily Benefit" of up to $144 per day for Nursing Home confinements.  (Certificate at 7.)  And the Certificate further waives premiums for "periods of Nursing Home Confinement for which benefits are payable."  (*Id.*)  On January 28, 2022, the couple moved to Sunnyside's Pannill Health Care Center ("Sunnyside Health Center").[8]  (Dkt. 20-17.)  Kenneth passed away on February 9, 2022.  (*Id.*)  Barbara passed away on July 10, 2022.  (*Id.*)

**B.      Procedural History**

On August 7, 2023, Thomas brought this action against Allstate in the Circuit Court for the County of Rockingham, Virginia. (Notice of Removal at 1–2 (Dkt. 1).)   In his complaint, Thomas alleged a breach of contract and a bad faith refusal to make a payment under the Certificate following Barbara and Kenneth's stay at Sunnyside.  (Compl. ¶ 1 (Dkt. 1-2).)  Specifically, Thomas claimed in Counts I and II that Allstate breached the terms of the policy by failing to pay the "Daily Benefit" to Kenneth and Barbara, respectively.  (*Id.* ¶¶ 38–

---

[8] Sunnyside Health Center, another Sunnyside facility, is licensed as a "nursing home" by Virginia.  However, Barbara and Kenneth's claims submitted to Allstate appear only related to the couple's stay at Sunnyside's assisted living facility.  The record does not indicate that Thomas attempted to initiate an additional claim after the couple moved into the Sunnyside Health Center in 2022.

53.)  And in Counts III and IV, Thomas claimed that Allstate breached the terms of the policy by not waiving, and continuing to collect, monthly premiums from Kenneth and Barbara, respectively.  (*Id.* ¶¶ 54–69.)  With respect to each Count, Thomas also alleged that Allstate acted in bad faith when it denied coverage, requesting costs and attorney's fees under Virginia Code § 38.2-209.

On September 5, 2023, Allstate removed the case from Rockingham County Circuit Court to the U.S. District Court for the Western District of Virginia at Harrisonburg.  (Dkt. 1.)  Following a Rule 16 Scheduling Conference, the case was set for a bench trial on January 29, 2025, in Harrisonburg.  (Dkts. 12, 15.)  Consistent with the prior Scheduling Order (Dkt. 17), both parties submitted motions for summary judgment, which are now fully briefed, (Dkts. 19, 21.)  On October 1, 2024, the court held a hearing on the motions.

## II.      Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Id.* (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). In order to grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

The standard is the same for cross-motions for summary judgment. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. *Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965).

If the summary judgment record "is insufficient for the court to determine either all claims or all elements of a single claim in connection with a motion for summary judgment, the court nevertheless may grant a motion for summary judgment in part as to any portion of a claim or with respect to an affirmative defense." *Fluor Fed. Sols., LLC v. BAE Sys. Ordnance*

*Sys., Inc.*, No. 7:19-CV-00698, 2023 WL 186819, at *3 (W.D. Va. Jan. 13, 2023) (citing 10B

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2734,

2735, 2737). "In providing such relief, the court may find that certain facts, issues, or portions

of claims have been established for purposes of trial and may grant partial summary judgment

on an affirmative defense." *Id.*

## III.   Analysis

### A.   Breach of Contract Claims

Thomas and Allstate both move for summary judgment on Thomas's breach of

contract claims, Counts I through IV.  (Allstate Mot. at 3; Thomas Mot. at 1.)  In its analysis

of the breach of contract claims with respect to Allstate's motion, the court interprets all

undisputed material facts in the light most favorable to Thomas.  And in its analysis of the

breach of contract claims with respect to Thomas's motion, the court interprets all undisputed

material facts in the light most favorable to Allstate.  *Rossignol*, 316 F.3d at 523.

In Virginia, "[t]he elements of a breach of contract action are: (1) a legally enforceable

obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that

obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *MCR*

*Fed., LLC v. JB&A, Inc.*, 808 S.E.2d 186, 195 (Va. 2017) (quoting *Filak v. George*, 594 S.E.2d

610, 614 (Va. 2004)).  This case focuses on the second of those elements: assessing whether

Allstate violated its obligations under the Certificate by declining to pay Barbara and Kenneth

a Daily Benefit (Counts I and II) and waive their premiums (Counts III and IV).

"Courts interpret insurance policies, like other contracts, by determining the parties'

intent from the words they have used in the document." *Va. Farm Bureau Mut. Ins. Co. v.*

*Williams*, 677 S.E.2d 299, 302 (Va. 2009).   "Provisions of an insurance policy must be considered and construed together, and any internal conflicts between provisions must be harmonized, if reasonably possible, to effectuate the parties' intent."   *Id.*

Whether the language used in a contract is unambiguous is a question of law for the court to consider.   *Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 243 (Va. 2016). "When a disputed policy term is unambiguous, we apply its plain meaning as written."   *Erie Ins. Exch. v. Jones by Hardison*, 870 S.E.2d 716, 718 (Va. 2022) (citation omitted).   However, "[w]hen a contract is ambiguous . . . a court should resort to parol evidence to ascertain the true intention of the parties."   *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995).   An ambiguity in a contract "is defined as 'the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time.'"   *Aetna Cas. & Sur. Co.*, 455 S.E.2d at 232 (quoting *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)).   But "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used."   *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002).

Additionally, when an insurance policy defines a term, courts should give the term its provided meaning.   *See Martirosov v. Shenandoah Flight Servs., Inc.*, 64 Va. Cir. 163, 2003 WL 23312786, at *9 (2004).   Otherwise, when the policy does not define a given term, courts "give the word its 'ordinary and accepted meaning.'"   *Transcon. Ins. Co. v. RBMW, Inc.*, 551 S.E.2d 313, 318 (Va. 2001) (quoting *Scottsdale Ins. Co. v. Glick*, 397 S.E.2d 105, 108 (Va. 1990)).   In Virginia, courts look to the dictionary definition to find the "ordinary and accepted meaning"

of undefined words within the policy.  *See, e.g.*, *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 330–31 (Va. 2000).

Under the Certificate, Allstate agreed to pay Barbara and Kenneth a "Daily Benefit for each day [they were] confined in a Nursing Home due to a Chronic Illness, beginning with the first day after the Waiting Period has been satisfied."  (Certificate at 3.)  Allstate raises several arguments as to why Barbara and Kenneth's stay at the Sunnyside facility should not qualify under the Certificate.

The parties join issue on a fundamental point: whether the Sunnyside facility is a "Nursing Home" under the Certificate's definition.  Recall that the defined term "Nursing Home" consists of three prongs, and "means a facility which:

> 1.  is licensed by the state in which the facility is located to provide Nursing Care for sick and injured persons at their expense;
> 2.  has 24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse; and
> 3.  maintains daily medical records for each patient.

(*Id.* at 2.)

The court addresses each prong in turn.[9]

---

[9] Thomas asserts that Allstate waived any arguments as to the second or third prongs of the "Nursing Home" definition because it originally denied coverage based only on the first prong during the claims process.  According to Thomas, Allstate waived its right to assert those additional coverage defenses by failing to assert them prior to litigation.  (*See* Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 15–17 (Dkt. 26) [hereinafter "Thomas Resp."].)  Thomas appears to assert a version of the "mend the hold" doctrine, which can be used to prevent an insurance company from raising a reason not contained within a pre-lawsuit claim denial letter as a later defense in litigation.  *See Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990) (Posner, J.) (explaining the origin and scope of the doctrine).  However, Thomas submits no authority showing that Virginia contract law recognizes such a doctrine.  Indeed, this court as well as others conclude that "a thorough search reveal[s] no Supreme Court of Virginia cases adopting that doctrine."  *Sedaghatpour v. Lemonade Ins. Co.*, 654 F. Supp. 3d 525, 531 (E.D. Va. 2023).  Instead, Thomas points only to *Employers Commercial Union Insurance Company of America v. Great American Insurance Company* to support his waiver argument.  200 S.E.2d 560 (Va. 1973).  But that case involved estoppel of an insurance claim based on the duty to defend.  *Id.* at 562–64.  In particular, the court there held that an insurer was estopped from rescinding an insured's policy after the insured had detrimentally relied on coverage.  *Id.* at 564.  The case does not speak to the waiver of a particular defense or ground for denial if the insurer does not assert it ahead of litigation, in the claim denial process.  Accordingly, the court finds Thomas's waiver arguments unpersuasive and analyzes both the second and third prongs of the "Nursing Home" definition in evaluating whether summary judgment is appropriate.

1.      Sunnyside is licensed by Virginia to provide "Nursing Care" for
sick or injured persons at their expense.

Under the first prong of the Certificate's definition of a "Nursing Home," a qualifying facility must be "licensed by the state in which the facility is located to provide Nursing Care for sick and injured persons at their expense."  (*Id.*)  This prong focuses on what types of things a facility can provide under its license issued by the state.  Specifically, the court considers whether Sunnyside is licensed by Virginia to provide what the Certificate calls "Nursing Care" for sick and injured persons at their expense.

To begin, the court considers what things Sunnyside is "licensed by [Virginia]" to provide.  (*Id.*)  Sunnyside holds an "Assisted Living Facility License."  (*See* Licenses at 1–2.) That license allows Sunnyside to provide two levels of care: "Assisted Living Care" and "Residential Living Care."  (*Id.*)  Both of those levels of care are defined by the Code of Virginia.  Assisted Living Care "means a level of service provided by an assisted living facility for adults who may have physical or mental impairments and require at least a moderate level of assistance with activities of daily living."  Va. Code Ann. § 63.2-100.  Residential living care "means a level of service provided by an assisted living facility for adults who may have physical or mental impairments and require only minimal assistance with the activities of daily living."  *Id.*  Additionally, under Virginia's regulations, "[a]ctivities of daily living" include "bathing, dressing, toileting, transferring, bowel control, bladder control, eating, and feeding." 22 Va. Admin. Code 40-73-10.

Next, the court considers what types of things the Certificate requires that facilities provide as "Nursing Care."  The Certificate defines "Nursing Care" as one of three levels of

care: (1) Medically Necessary Skilled Care, (2) Intermediate Care or (3) Custodial Care. (Certificate at 2.) "Custodial Care" is further defined in the Certificate as care "which is mainly for the purpose of assisting in the Activities of Daily Living of the Insured Person and is performed in accordance with the Plan of Treatment." (*Id.*) And the "Activities of Daily Living" defined in the Certificate include "eating, toileting, mobility, bathing or dressing." (*Id.*)

The Code and Regulations of Virginia unambiguously permit Sunnyside—which is licensed to provide "Assisted Living Care"—to provide services that constitute "Nursing Care" under the Certificate to sick and injured persons at their expense. That is because Sunnyside is licensed by Virginia to provide "at least a moderate level of assistance" with "bathing, dressing, toileting, transferring, bowel control, bladder control, eating, and feeding," Va. Code Ann. § 63.2-100; 22 Va. Admin. Code 40-73-10, many of the *exact* activities the Certificate describes as "Custodial Care."

Allstate's arguments resisting that conclusion are not persuasive. First, Allstate argues that because Sunnyside holds an "Assisted Living Facility License" and not a "Nursing Home License," it is impossible for it to meet the definition of "Nursing Home" under the Certificate. According to Allstate, under Virginia law, only facilities licensed by the state as "nursing homes" can provide continuous medical treatment in a health care facility. While that statement may be true, nowhere in the Certificate's first prong does the facility need to provide continuous medical treatment in a health care facility. Instead, the parties agreed that a "Nursing Home" is a facility that is "licensed by the state in which the facility is located to provide Nursing Care for sick and injured persons at their expense." (Certificate at 2.) Thus,

Allstate's lengthy analysis of what a Virginia-licensed nursing home may do under the Code of Virginia is unavailing under the first prong.

Second, Allstate reads much into the fact that Virginia licenses nursing homes through the Department of Health and licenses assisted living facilities through the Department of Social Services. According to Allstate, that difference demonstrates that Virginia-licensed nursing homes do different types of things than facilities licensed as assisted living facilities. But nowhere in the first prong of the Certificate's definition of "Nursing Home" is a requirement that the facility must be licensed by the Department of Health. (*See id.*) It simply must be "licensed by the state in which the facility is located." That requirement is easily met here. The court finds that licensure "by the state" unambiguously includes licensure as an assisted living facility by the Department of Social Services. *See* Va. Code. Ann. § 63.2-200 (creating the Department of Social Services under Virginia's Executive Branch).

Third, Allstate stresses that Sunnyside's own representative did not believe that the Sunnyside facility constitutes what would commonly be understood as a "nursing home." Allstate points to statements from its representative regarding the care provided at the facility, where they testified that its employees know that Sunnyside is not a nursing home and have never held itself out as one. (Dep. of Sunnyside Corporate Representatives at 18:23–19:18 (Dkt. 22-15) [hereinafter "Sunnyside Dep"].)[10] However, this argument misses the mark in two ways. For one, while the representative was clear that Sunnyside was not held out as a "nursing home" as defined by Virginia Code § 32.1-123, that belief has no bearing on whether

---

[10] The parties included portions of the deposition transcript of Sunnyside's Corporate Representatives in their briefing on these cross-motions for summary judgment. The court requested the full transcript, which is part of the court's record. (*See* Dkt. 35.)

Sunnyside met the definition of "Nursing Home" under the Certificate. In addition, the first prong focuses on what services a particular licensure regime permits, not the specific services that a facility offers at any one moment. In other words, the analysis of the first prong focuses on what the Virginia-issued license of the facility allows a hypothetical facility to do, not what Sunnyside chooses to do or provides to Barbara and Kenneth. *See Bennett v. Allstate Life Ins. Co.*, 623 F. Supp. 3d 1236, 1245 (W.D. Okla. 2022) ("[A] facility can only satisfy the Certificate definition based on the type of care it is *licensed* to provide. The treatment of any specific resident is immaterial under the Certificate's definition.").

Fourth, at the hearing, Allstate asserted for the first time that Sunnyside cannot meet the first prong of the "Nursing Home" definition because it does not care for "sick and injured persons at their expense." (*See* Certificate at 2.) According to Allstate, based on the Virginia definition of "assisted living facility," Sunnyside simply cannot care for sick or injured persons. But that regulatory definition merely provides that an "assisted living facility" is "any congregate residential setting that provides or coordinates personal and health care services, 24-hour supervision, and assistance (scheduled and unscheduled) for the maintenance or care of four or more adults who are aged or infirm or who have disabilities and who are cared for in a primarily residential setting." 22 Va. Admin. Code 40-73-10. Because "sick" is not defined in the Certificate, the court gives the words its ordinary and accepted meaning. A sick person is one who is "affected with disease or ill health." *See Sick*, Merriam-Webster Online Dictionary, https://perma.cc/ZSS7-66VV. The court finds that someone in an "assisted living facility" who is "infirm" or disabled meets the definition of a "sick person" because they are "affected with . . . ill health." Allstate's argument is also belied by the undisputed fact that

Barbara and Kenneth both have "Chronic Illness[es]" under the terms of the Certificate.  (*See* Dkt. 20-3 at 3; Dkt. 20-4 at 3.)  The Certificate defines "Chronic Illness" as "an illness for which an Insured Person requires assistance with one of the Activities of Daily Living, as certified by a Doctor in a Plan of Treatment." (Certificate at 2.)  It is difficult to dispute that a person with an "illness" would be considered a "sick . . . person."  Allstate's argument that Sunnyside could not provide Custodial Care to sick or injured persons fails.

The parties also dispute the applicability of *Bennett v. Allstate Life Insurance Company*, a case in which the U.S. District Court for the Western District of Oklahoma reviewed a nearly identical policy and found that the assisted living center at issue "satisfie[d] the contract definition of Nursing Home" in the certificate.  623 F. Supp. 3d at 1239–40.  In *Bennett*, the first prong of the "Nursing Home" definition was slightly different.  There, the Certificate defined "Nursing Home" as a facility "licensed by the state in which the facility is located to *provide care* for sick and injured persons at their expense."  *Id.* at 1240 (emphasis added).  Recall that the first prong of the definition for Barbara and Kenneth's policy includes a defined term, "Nursing Care."  (*See* Certificate at 2 ("Nursing Home means a facility which . . . is licensed by the state in which the facility is located to *provide Nursing Care* for sick and injured persons at their expense . . . ." (emphasis added)).)

In *Bennett*, it was undisputed that the assisted living center satisfied the second and third prongs of the definition, so the analysis focused squarely on the first prong.  623 F. Supp. 3d at 1245.  The court found that the first prong does not look to the "treatment of any specific resident" by a facility, but noted instead that "a facility can only satisfy the Certificate definition based on the type of care it is *licensed* to provide."  *Id.*  Like the analysis undertaken above, the

court reviewed state law to determine if the facility at issue was "licensed by the state to perform a specific function—provid[ing] care for sick and injured people." *Id.* The court found that the Oklahoma statutes and regulations permitted assisted living centers to care for sick and injured persons, so the assisted living center unambiguously met the first prong of the "Nursing Home" definition. *Id.* at 1245, 1248.

Allstate claims, however, that Oklahoma law is more permissive in what it allows assisted living facilities to do than Virginia law. Oklahoma defines an assisted living center, in part, as a "home or establishment offering, coordinating or providing services to two or more persons who . . . may need intermittent or unscheduled nursing care" and "may need medical assistance." *Id.* at 1245 (quoting Okla. Stat. tit. 63, § 1-890.2). "Intermittent or unscheduled nursing care" is defined as "skilled nursing care given by a licensed practical nurse or registered nurse that is not required twenty-four (24) hours a day." *Id.* (quoting Okla. Admin. Code § 310:663-1-2). Those provisions "unambiguously permit[ted] [assisted living centers] to care for sick and injured persons." *Id.*

Allstate points out that, by contrast, Virginia defines an "assisted living facility" as "any congregate residential setting that provides or coordinates personal and health care services, 24-hour supervision, and assistance (scheduled and unscheduled) for the *maintenance or care* of four or more adults who are aged or infirm or who have disabilities and who are cared for in a primarily residential setting." 22 Va. Admin. Code 40-73-10 (emphasis added). "Maintenance or care means the protection, general supervision, and oversight of the physical and mental well-being of an individual who is aged or infirm or who has a disability." *Id.* Allstate argues that "maintenance or care" in a Virginia-licensed assisted living facility cannot

equate to the type of care someone can receive in a Virginia-licensed nursing home.  But once again, this argument misses the point.  While the court acknowledges that the care is likely different, the real focus should be on the words of the Certificate's first prong and how the Certificate defines the term "Nursing Home."

For these reasons, the court finds there is no genuine dispute as to any fact regarding Sunnyside's license by Virginia and the services that the license allows it to provide.  As a result, the court concludes that the first prong of the definition of "Nursing Home" is unambiguous, and as a matter of law, Sunnyside meets that portion of the definition because it is licensed by Virginia to provide services equating to "Custodial Care," a form of "Nursing Care," to sick or injured persons at their expense.[11]

### 2.    Sunnyside has 24-hour nursing service by or under the supervision of a licensed practical nurse or registered nurse.

Under the second prong of the definition, a qualifying facility must "ha[ve] 24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse." to constitute a "Nursing Home."  (Certificate at 2.)  "Nursing service" is not a defined term in the Certificate.  As a result, the court gives "nursing service" its "ordinary and accepted meaning." *Transcon. Ins. Co.*, 551 S.E.2d at 318.  Relevant definitions of "service" include "the work performed by one that serves" (such as "good service") and "useful labor that does not produce a tangible commodity" (such as "professional services").  *Service*, Merriam-Webster

---

[11]  Because the court finds that Sunnyside meets the first prong of the "Nursing Home" definition contained within the Certificate based on its license by Virginia to provide "Custodial Care," it does not need to address Thomas's secondary argument that Sunnyside is licensed to provide "Medically Necessary Skilled . . . Care."

Online Dictionary, https://perma.cc/VLZ5-FYKK.  The court finds that the ordinary and accepted meaning of "nursing service" is work or useful labor performed by a nurse.

In filling out the Questionnaire, Sunnyside noted that it had "2 Registered Nurses" who worked one eight-hour shift per day and "10 [Licensed Practical Nurses]/[Licensed Vocational Nurses]" who worked three eight hour shifts per day.  (Questionnaire at 1.) Further, in explaining Sunnyside's coverage during a deposition, its representative explained that "we staff with nursing on every shift around the clock.  On 7 to 3, we have three nurses; on 3 to 11, we have three nurses; and on 11 to 7, we have one."  (Sunnyside Dep. at 52:20–53:1.)  And in responding to a question about whether Sunnyside is limited in what things its nurses can do, its representative stated that Sunnyside "provide[s] 24-hour nursing care in our assisted living."  (Sunnyside Dep. at 11:17–22.)

Allstate concedes that Sunnyside indeed indicates on the Questionnaire that "at least some nursing services were provided 24 hours per day."  (Def.'s Br. in Support of Mot. for Summ. J. at 15 (Dkt. 23) [hereafter "Allstate Br."].)  But it disputes whether Sunnyside actually provides such services.  However, none of Allstate's arguments to the contrary are persuasive.

First, Allstate argues that Sunnyside's "licensing [as an assisted living facility] prevented it from providing continuous 24-hour care to residents."  (*Id.*)  As support, it points to the testimony of its employee, Sanford, who stated that Sunnyside was "licensed as a nonmedical residential facility, so [it is] not able to provide the continuous 24/7, 365-day care, nursing care that the certificate would require."  (Sanford Dep. at 124:12–16.)  Allstate argues that Sanford denied Thomas's claims because 24-hour continual nursing services can *only* be provided by medical facilities, and Sunnyside is not a medical facility.  (*See id.* at 124:24–125:6.)  But

Allstate's argument again strays from the Certificate's language.  Nothing in the Certificate's second prong requires "nursing services" be provided "continuously" or in a "medical facility."  Nor does the prong require "24-hour-a-day monitoring."  Instead, to constitute a "Nursing Home" under the definition the parties agreed to, the facility must "ha[ve] 24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse." (Certificate at 2.)

Second, Allstate points to the statements of Sunnyside's corporate representative who testified that if a person needed continuous, 24-hour nursing care, that person could not reside in Sunnyside, and would be required to move out of the assisted living facility.  Sunnyside's representative agreed that if Sunnyside "provide[d] nursing services or other type[s] of medical services outside [their] license, then the Department of Social Services can shut [Sunnyside] down," fine Sunnyside, or cause Sunnyside to lose its license.  (Sunnyside Dep. at 47:2–7.) And because of that, Sunnyside's representative agreed that it "absolutely cannot provide the nursing services . . . on a 24-hour basis in an assisted living facility that a nursing home can provide."  (*Id.* at 47:8–14.; *see also id.* at 84:13–16 (confirming that Sunnyside's Heath Care facility—licensed as a nursing home—is "able to provide the nursing care and nursing services 24 hours a day that [Sunnyside] assisted living cannot").)  But once again, these statements simply show that Sunnyside's representative recognized that facilities licensed as "nursing homes" by Virginia are different than "assisted living facilities."  The statements do not show that Sunnyside does not "ha[ve] 24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse" to constitute a "Nursing Home" as defined in the Certificate.  (Certificate at 2.)

Third, Allstate points to Sunnyside's Assisted Living Occupancy Agreement that residents sign to assert that Sunnyside does not provide nursing services on a 24-hour basis *except* in cases of emergency. (Allstate Br. at 16.) In full, that section of the agreement states that "Sunnyside shall provide assistance with the activities of daily living, including bathing, dressing, taking of prescribed medication, etc. This assistance will be provided by Sunnyside's nursing staff in the Assisted Living Unit. *Nursing personnel are available, in cases of emergency, on a 24-hour basis.*" (Assisted Living Occupancy Agreement (Dkt. 22-15 at 67) (emphasis added)).) Contrary to Allstate's assertion, this section of the occupancy agreement, titled "Nursing Services," simply confirms nursing staff at Sunnyside provides assistance with the activities of daily living around-the-clock and is also available on a 24-hour basis in case of emergency.

For these reasons, the court finds there is no genuine dispute as to any fact regarding Sunnyside's provision of 24-hour nursing services by the required personnel. As a result, the court concludes that the second prong of the definition of "Nursing Home" is unambiguous, and as a matter of law, Sunnyside meets that portion of the definition because it provides "24 hour nursing service by or under the supervision of a licensed practical nurse or registered nurse."

### 3.   A genuine dispute of material facts exists as to whether Sunnyside maintains daily medical records for each patient.

Under the third prong of the definition, a qualifying facility must "maintain[] daily medical records for each patient" to constitute a "Nursing Home." (Certificate at 2.)

"Patient" is not a defined term under the Certificate. And its mention in the third prong is the term's only use in the Certificate. As a result, the court gives "patient" its "ordinary and accepted meaning." *Transcon. Ins. Co.*, 551 S.E.2d at 318. Thomas submits that

the definition of "patient" is "the recipient of any of various personal services" by pointing to a dictionary definition. *Patient*, Merriam-Webster Online Dictionary, https://perma.cc/J6K7-Z9EW. However, the first definition from the same source also provides that a "patient" is "an individual awaiting or under medical care and treatment." *Id.* And while Allstate does not provide a definition of the term "patient," it implicitly suggests something close to the first definition by arguing that Sunnyside, as a nonmedical assisted living facility, cannot have "patients" and instead has "residents."

As described above, under the plain policy language of the Certificate, the undefined term "patient" can be understood to have more than one meaning. *See Aetna Cas. & Sur. Co.*, 455 S.E.2d at 232. However, the court finds that any ambiguity in the term "patient" is resolved by reference to extrinsic evidence, in favor of Thomas's definition. *Cascades N. Venture Ltd. P'ship v. PRC Inc.*, 457 S.E.2d 370, 373 (Va. 1995). In the context of assisted living facilities and nursing homes, the terms "patient" and "resident" are often treated interchangeably. Indeed, Virginia's licensure regulations for nursing homes utilizes a defined term "resident" as opposed to "patient," which means "the primary *service recipient*, admitted to the nursing facility, whether that person is referred to as a client, consumer, patient, or other term." 12 Va. Admin. Code 5-371-10 (emphasis added). And Josh Lyons, President and CEO of Sunnyside, testified that there is no difference between the term "resident" and "patient" when referencing individuals in varying levels of care at Sunnyside. Specifically, he testified that individuals are considered "a resident of the assisted living facility or they are a resident of the nursing center. We treat it the same." (Sunnyside Dep. at 16:14–18.) The interchangeability suggests that "patient" in the context of the Certificate does not refer only

to those receiving medical care, and instead, refers to individuals receiving some kind of service.[12]

"Daily medical records" is also not defined under the Certificate.  As a result, the court gives the term its ordinary and accepted meaning.  *Transcon. Ins. Co.*, 551 S.E.2d at 318.  The dictionary defines "medical record" as "a record of a patient's medical information (as medical history, care or treatments received, test results, diagnoses, and medications taken)."  *Medical Record*, Merriam-Webster Online Dictionary, https://perma.cc/HF69-W5QU.  Thus, the court finds that "daily medical records" are ordinarily understood as the recordation of a patient's medical information from a variety of sources, documented every day.

Allstate argues that Sunnyside does not keep such records every day for each patient. Instead, it claims records are kept on an "as-needed basis."  (Def.'s Opp'n to Pls.' Mot. for Summ. J. and Partial Summ. J. at 16 (Dkt. 25).)  As support, Allstate points to the deposition of Sunnyside's corporate representative, who confirmed that records of care, assistance, or medication "are only made as needed."  (Sunnyside Dep. at 38:23–39:13.)  Indeed, Sunnyside's representative agreed that if a Sunnyside resident "did not receive any assistance with an activity of daily living" on a particular day, "there would . . . not be a notation for that person." (*Id.*)  The representative also confirmed that Sunnyside does keep daily records for some residents, but only after an outside physician gives orders to do so.  (*Id.* at 115:16–116:10.) Thus, Allstate submits that Sunnyside testified that daily medical records are not required "unless there is something going on" with the resident.  (*Id.* at 116:11–22.)

---

[12] The court notes that this approach is consistent with another interpretative principle under Virginia law, that if a term in an insurance policy could "be understood to have more than one meaning," the court will "construe the language in favor of coverage and against the insurer."  *Erie Ins. Exch.*, 870 S.E.2d at 718 (citation omitted).

However, Thomas points to other portions of the deposition transcript, in which Sunnyside's representative, when asked if Sunnyside kept a "daily medical record," responded:

> It depends on what you mean by "daily medical record." We do keep MARs, which are medication administration records, that are kept on a daily basis. We also keep records, charting records, on care provided and of activities of daily living that's done on a daily basis. We also do progress notes that are done frequently, not always on a daily basis. But there is level of documentation that's done on our assisted living residents every day.

(*Id.* at 36:16–25.)

So Sunnyside's representative testified that they keep a "medical administration record" on a daily basis every time medicines are given out. And that representative also confirmed that "everybody who lives in assisted living ha[s] medicines that are given to them on a daily basis." (*Id.* at 37:25–38:3.) Sunnyside's representative also stated that, while Sunnyside did not keep records "to the same degree" as a nursing home, "some records are very similar" to those kept in a nursing home, "such as medication records, vital signs records, weight records, notes from a dietician, notes from nurses, physician progress notes." (*Id.* at 92:15–19.) And during "the period of COVID," staff "monitor[ed] residents' temperatures and vital signs every shift." (*Id.* at 105:16–22.) Finally, when filling out the Questionnaire, Sunnyside responded to the question of "[w]ith what frequency do you log patient medical or service records?" with "every shift." (Questionnaire at 1.) Indeed, that response was acknowledged by Allstate and LifeCare in the claims history reports for Barbara and Kenneth. (*See* Dkt. 20-3 at 3 ("The facility maintains daily medical records."); Dkt. 20-4 at 3 (same).)

Based on the record before the court, the evidence is mixed on the issue of whether Sunnyside kept daily medical records for each patient. Accordingly, the court finds that neither party has demonstrated that there is no genuine dispute of material fact as to whether

Sunnyside maintained daily medical records for each patient.  Therefore, the court concludes that neither party is entitled to judgment as a matter of law as to the third prong of the Certificate's definition of "Nursing Home" and both motions will be denied on this issue.

4.    Barbara and Kenneth were "confined."

Apart from the definition of "Nursing Home," Allstate makes an additional argument as to why Thomas's breach of contract claims fail.  Under the Certificate, Daily Benefits are only available when the insured person is "confined in a Nursing Home due to a Chronic Illness."  (Certificate at 3.)  Allstate argues that Thomas cannot demonstrate that Barbara and Kenneth were ever "confined" at Sunnyside.  (Allstate Br. at 6.)  As support, Allstate points to the deposition of Sunnyside's corporate representative, who agreed that Barbara and Kenneth were "not confined."  (Sunnyside Dep. at 26:21–23.)

"Confined," however, is not a defined term in the Certificate.  The parties dispute the meaning of the term "confined" as used in the Certificate.  Allstate submits that the court should look to Virginia law to define "confine" as "the state of being imprisoned or restrained."  (Allstate Br. at 18 (quoting *Bing v. Haywood*, 722 S.E.2d 244, 247 (Va. 2012).)  Thomas argues that "confined" is properly understood to refer to the state of being limited to a particular location.    *See Confined*, Merriam-Webster Online Dictionary, https://perma.cc/9SCR-URLD.

Because the term is not defined, the court interprets "confined" according to its ordinary and accepted meaning.  Words in "an insurance policy must be considered and construed together, and any internal conflicts between provisions must be harmonized, if reasonably possible, to effectuate the parties' intent."  *Williams*, 677 S.E.2d at 302.  In the

context of a Certificate, an insurance policy addressing long term care, Thomas's definition is persuasive.  Being "confined" in the sense used by the Certificate is ordinarily understood to mean the limitation of movement by reason of a person's physical or mental condition, not a state of imprisonment.

The court finds it is undisputed that Barbara and Kenneth needed to be in a facility that provided them with assistance because of their illnesses—and were therefore confined to Sunnyside—for several reasons.  First, the LifeCare intake form notes that both Barbara and Kenneth stopped driving and describes the couple's mobility and cognitive challenges.  (Dkt. 22-2 at 3, 6.)  Second, internal claims history documents note that Kenneth "require[d] prompting and cueing with bathing due to dementia" and that his "doctor recommend[ed] supervision in a structured environment since [his] wife is no longer able to take care of him." (Dkt. 22-5 at 6.)  Finally, the same document notes for Barbara that she suffers from "motor neuron disease," "require[d] assistance w/ bathing, dressing (buttons and zippers), toileting and transferring," and "uses a walker/cane in order to ambulate."  (*Id.* at 15.)

Based on the record before the court, it is undisputed that Barbara and Kenneth were "confined" to Sunnyside because of their mobility and cognitive difficulties.  The court will deny Allstate's summary judgment motion on this ground.

## B.   Bad Faith Denial

Thomas moves for partial summary judgment on his bad faith denial claim pursuant to Virginia Code § 38.2-209.  (Thomas Mot. at 1.)  Allstate moves for summary judgment on the same bad faith denial claim.  Section 38.2-209(A) provides that

> [n]otwithstanding any provision of law to the contrary, in any civil case in which
> an insured individual sues his insurer to determine what coverage, if any, exists

under his present policy or fidelity bond or the extent to which his insurer is liable for compensating a covered loss, the individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award. However, these costs and attorney's fees shall not be awarded unless the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy.

Va. Code Ann. § 38.2-209(A).

"[I]n evaluating the conduct of an insurer, courts should apply a reasonableness standard." *Cuna Mut. Ins. Soc'y v. Norman*, 375 S.E.2d 724, 726–27 (Va. 1989). Under that standard, a bad faith analysis "generally would require consideration of such questions as whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact." *Id.* at 727.

However, "judgment against the insurer on a substantive claim is a prerequisite to recovery of attorneys' fees and costs under § 38.2-209." *Saint John's Afr. Methodist Episcopal Church v. GuideOne Specialty Mut. Ins. Co.*, 902 F. Supp. 2d 783, 786 (E.D. Va. 2012); *see also REVI, LLC v. Chi. Title Ins. Co.*, 776 S.E.2d 808, 813 (Va. 2015) ("[T]he section authorizes the court to award attorney's fees and costs *after* the insured establishes coverage under the disputed policy, and the court finds that the insurer denied coverage in bad faith." (emphasis added)). That is because the provision "does not provide an independent cause of action for relief," and "may be invoked only after the entry of judgment." *Selective Ins. Co. of the Se. v.*

- 27 -

*Williamsburg Christian Acad.*, 458 F. Supp. 3d 409, 418 (E.D. Va. 2020) (collecting cases).  "Thus, a plaintiff may only recover the costs of litigating an insurer's bad faith refusal to pay under § 38.2-209 (A), if he first proves that the insurer breached the insurance contract."  *Leighton v. Homesite Ins. Co. of the Midwest*, No. 2:21CV490, 2022 WL 2904169, at *3 (E.D. Va. Jan. 12, 2022).

Because the court denies the parties' summary judgment motions on the breach of contract claims, the court must reserve judgment on Thomas's request for attorney's fees under § 38.2-209 until after the trial.  *See A-View Est. Tr. v. Allstate*, 109 Va. Cir. 26, 2021 WL 10256837 (2021).  The court denies both Thomas's partial motion for summary judgment and Allstate's motion for summary judgment on this issue.  At trial, the parties should be prepared to present evidence related to the *Norman* factors outlined above.

### IV.    Conclusion

For the foregoing reasons, the court **GRANTS in part** and **DENIES in part** Thomas's motion for summary judgment and partial summary judgment. (Dkt. 19.)  The court **DENIES** Allstate's motion for summary judgment.  (Dkt. 21.)  The case remains set for a bench trial on January 29, 2025, to resolve the two remaining issues: (1) whether Sunnyside meets the third prong of the definition of "Nursing Home," such that Thomas is entitled to recover for breach of contract; and (2) whether Allstate denied insurance coverage in bad faith.  An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 29th day of October, 2024.

/s/ *Jasmine H. Yoon*
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE